

## NUMBER 13-09-00572-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**MARIO ALBERTO QUINTANILLA,** <span style="float:right">**Appellant,**</span>

**v.**

**THE STATE OF TEXAS,** <span style="float:right">**Appellee.**</span>

---

### On appeal from the 139th District Court
### of Hidalgo County, Texas.

---

### MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Chief Justice Valdez

Pro se appellant, Mario Alberto Quintanilla, was convicted of capital murder.[1]

*See* TEX. PENAL CODE ANN. § 19.03(a)(2) (West Supp. 2011); *see also id.* § 19.02(b)(1)

---

[1] The facts regarding how Quintanilla's decision to proceed pro se on appeal are detailed in the trial court's order following abatement and in the reporter's records of the hearings held on the matter. We have summarized the facts below.

After determining that Quintanilla was indigent, the trial court appointed an appellate attorney who did not timely file a brief with this Court. We abated and remanded the case to the trial court with instructions to determine whether new counsel should be appointed. Appellate counsel filed a brief with

(West 2011). By four issues, Quintanilla contends that: (1) the evidence was insufficient to corroborate the testimony of Gerardo Garcia and Jesus Cortez; (2) it was constitutionally inadmissible to "force" the co-defendant, Alfredo Valdez, to testify "against his will" "over objection in the presence of the jury"; (3) the trial court improperly required Quintanilla to take off his shirt; and (4) the evidence was insufficient to support the conviction. We affirm.

## I.    THE EVIDENCE[2]

Jason Alba Lyons testified that while he was in prison for aggravated assault, he became a member of the "prison gang" the Hermano Pistoleros Latinos ("HPL"), meaning in English, the "Brotherhood of the Latin Gunslingers, gangsters." According to Lyons, HPL engages in organized crime, which includes, "[a]nything that's against the law, basically . . . from robbing . . . to burglaries, even murders. . . . Drug dealings . . . . [smuggling]." Lyons testified regarding the practices of the organization. Lyons claimed that when he was released from prison in 2004, he was in the leadership position called an "Encargo" with the HPL. Lyons explained that, as the Encargo, he was the leader of "all the pistoleros in the [Rio Grande] Valley." Lyons stated that he was a member of HPL for approximately seven years.

---

this Court on February 8, 2012, the day before the hearing. The trial court determined that the option of appointing new counsel on appeal was not appropriate. Quintanilla indicated that he wished to proceed pro se.

The trial court gave Quintanilla a few days to review the brief filed by appellate counsel, to discuss any issues he thought should be raised in the brief with appellate counsel, and to consider his decision. The trial court held a second hearing on February 13, 2012. At this hearing, Quintanilla stated that he had reviewed the brief filed by his appellate counsel and that he wanted to proceed pro se. Quintanilla's appointed appellate counsel withdrew from the case. Quintanilla then filed his pro se brief in this case with our Court.

[2] On December 21, 2005, Larissa Cavazos was murdered in the apartment that she shared with her brother Sergio Cavazos. The jury convicted Quintanilla of Larissa's murder, and he is appealing from that conviction in this case.

2

Lyons testified that he lived at El Bosque Apartments in Edinburg, Texas from 2004 until 2007. In 2005, Lyons was known as "Gotti," and he knew Quintanilla as a member of HPL. Lyons testified that Quintanilla visited his apartment on Saturday, December 17 and Sunday, December 18, 2005 with "Toto," "Fro," and two strippers named Liz and Mercedes.[3] According to Lyons, the group was drinking beer and doing cocaine. Lyons testified that when the cocaine ran out sometime early Sunday morning, he and Quintanilla decided to go and buy some more from Lyons's "connection," Bobby Foreman.[4]

Lyons said that he called Foreman on his cell phone and that Foreman told Lyons that the cocaine would be in the mailbox outside of an apartment where Foreman was staying. Foreman was at the Schunior Apartments, which was "the next block" from the El Bosque Apartments. Lyons stated that Foreman wanted him to leave the money in the mailbox. Lyons explained that because the plan was for Quintanilla to drive him to pick up the cocaine, he and Bobby agreed that it was easier to do the transaction through the mailbox. However, according to Lyons, when he arrived, the cocaine was not in the mailbox. Lyons called Foreman and then went to the apartment where Foreman said he was staying.

Lyons claimed that he told Quintanilla to wait in the car "because [he] did not want to take [Quintanilla] to [his] contact." Lyons stated, "I didn't know [Quintanilla] that well. I really didn't trust him." Lyons was concerned that Quintanilla would not "be able to give that same respect to my connection that I gave." Lyons explained:

---

[3] Lyons stated that "Toto" and "Fro" were nicknames and he did not recall their full names. He thought that Fro's last name may have been Flores. Lyons did not state Liz's and Mercedes's last names.

[4] Lyons testified that he worked at a club with Foreman and that they had a friendship.

3

Well, my connection trusted me that he would always get his money. If he had to even give me the product first, I'd always give him his money. We had an understanding. We had a trust. We were friends. [Quintanilla], I didn't know on that terms and didn't have that trust with him.

. . . .

Well, if he wants to disrespect him, or jack him for his product, or something like that, that would fall back on me.

. . . .

Because I'd be the one to introduce him. I would have been the one that brought him there, and it would never happen had I not introduced him, if he was to do something like that.

Lyons stated that he had never been to the apartment and had never purchased cocaine from Foreman at that apartment. Lyons entered the front door of the apartment, went to the first room on the left, and made the transaction for the cocaine. According to Lyons, there was then a knock on the front door of the apartment. Lyons said,

We happened to be—[Quintanilla] came to the front door, you know. I looked at [Foreman], and I'm, like, "Hey, sorry. I'm getting out of here anyway." I told him, "Hey." I told [Quintanilla], you know, "Hey, don't—I told you to wait outside. Don't come to the door."

He told me, "Well, I want to, you know—why can't I meet this guy? Why are you acting like you're embarrassed of me or something?" I said, "I'm not. It's just, later on I'll introduce you to him. But this guy, he moves big, sells a lot of cocaine, doesn't want just anybody coming in, you know. Just wait. I'll introduce you another time, you know."

So he says, "Well, maybe we can meet him later on." I says, "He's leaving out of town so, you know, just later on, when he gets back, I'll introduce you." I just kept telling him that because he was very persistent about wanting to meet the guy. I just didn't feel well about that.

. . . .

We got in the car, and we took off. He was still proceeding to tell me about if he's—you know, he's supposed to be my brother. That guy is not my brother. Why didn't I just introduce him. I told him, "Let's just go

4

do this cocaine. We'll go party with the girls and stuff, and just forget about him, you know."

Lyons testified that once he and Quintanilla returned to his apartment, the group resumed the partying. However, according to Lyons, at some point, members of the group wanted to smoke the cocaine, and he did not approve, so Quintanilla and the others left Lyons's apartment. Lyons believed that perhaps one of the girls stayed with him, but he could not recall.

On cross-examination, Lyons stated that he felt responsible for what happened on December 21, 2005 because he introduced Quintanilla to Foreman.[5] Lyons said that he "felt a moral obligation to give testimony to exactly what [he] knew could have happened and how it took place."[6] Lyons acknowledged that he did not think that Foreman was in danger and he did not warn Foreman because he did not "think to that extent," but Lyons had "some instinct, you know not to trust [Quintanilla]." Lyons explained that it is "understood" that when a person does not know the connection, that person should not even attempt to meet the connection. Lyons explained that it is understood that actions like that could even get a person killed. Lyons stated, "Why you want to know who this guy is, you know. . . . I mean, it's something you don't really ask, really."

On re-direct examination, Lyons agreed that he had a higher ranking in HPL than Quintanilla, that he told Quintanilla to stay in the car, and that Quintanilla disobeyed Lyons's request.

---

[5] Larissa was murdered in the apartment where Lyons claimed he bought cocaine from Foreman.

[6] Although, Quintanilla's defense counsel objected to Lyons's answer as nonresponsive and the trial court instructed Lyons to listen to the question and answer the question asked, the response was not stricken from the record and the jury was not instructed to disregard Lyons's response.

Foreman testified that in 2005, he was working at a club in the Valley as a promoter and also sold cocaine and marihuana. Foreman lived at the Schunior Village Apartments in Edinburg. While living at Schunior Village, Foreman met Sergio Cavazos ("Sergio") when Foreman was walking back from the University of Texas—Pan American, which was approximately five hundred feet away from the complex. Sergio allegedly asked Foreman if he knew where to get some marihuana; Foreman gave Sergio "a stack." Sergio also lived in the same apartment complex on the same street as Foreman.

According to Foreman, Sergio continued to purchase marihuana from him and they became friends, then Sergio began buying cocaine from Foreman. Foreman testified that he also knew Sergio's cousin, Edward Cantu, and that "Eddie" would give him rides and they "had hung out." Foreman was aware that Sergio's sister lived with him; however, he never met her.

Foreman met Lyons, whom he knew as "Gotti," at work. Foreman stated that he and Lyons were "real close friends, and . . . would talk sometimes and hang out after work and stuff like that." Foreman also sold cocaine to Lyons.

Foreman stated that on December 18, 2005 after work, at sometime after 2:00 a.m., he went to "hang out" with Sergio and Cantu at Sergio's apartment.[7] Foreman testified that while he was at Sergio's apartment, he received a call from Lyons asking for some cocaine and that he told Lyons that the cocaine would be in the mailbox. According to Foreman, he fell asleep, so he did not put the cocaine in the mailbox. Foreman stated that about 5:30 or 6:00 a.m., he received another phone call from

---

[7] Larissa was not at the apartment that night.

6

Lyons, and he told Lyons to come to Sergio's apartment to get the cocaine. Foreman testified that he gave Lyons directions to the apartment. Foreman stated that Lyons did not know Sergio and Cantu, but that Lyons did know that he "hung out" with them.

Foreman testified that he was asleep when Lyons knocked on the door, and Cantu woke him up. Foreman and Lyons made the transaction in the bedroom and when Lyons was preparing to leave, they heard a knock at the door. Foreman stated, "Some guy in some glasses and—some black-shade glasses and a coat, with some tattoos, was at the door. [Lyons] apologized to me about him and asked the dude what was he doing there." Foreman had never seen the person before. According to Foreman, Lyons asked the person what he was doing there and said, "I told you to wait for me."[8] When asked how he felt when the person knocked on the door, Foreman replied, "I felt uncomfortable . . . because it wasn't my house for one. And, two, I didn't know him." Foreman explained that he did not know whether this person was an undercover agent or if the transaction was possibly a "setup." According to Foreman, he had never sold drugs from Sergio's apartment before this occasion.

Shortly after making this transaction, Foreman packed his belongings and his wife drove him to the McAllen bus station. He went to Oklahoma for a week on a trip that had previously been planned. Foreman found out on December 23, 2005, that Sergio's sister was killed and that the police wanted to talk to him. He called Officer Joe Vega from the Edinburg Police Department to let them know that he was out of town. When he returned to Edinburg, Foreman went to the police station to make a statement.

---

[8] Foreman denied that Quintanilla was the person who knocked on the door that day. Foreman stated he believed it was a man known as "Fro."

7

Edward Javier Cantu testified that on December 18, 2005, he was alone in Sergio's apartment with Foreman. Cantu was awakened by the doorbell and observed Foreman with a man he introduced as "Gotti."

Cantu discovered Larissa's body on December 21, 2005 in her apartment. He then dialed 911, and the police arrived.

Fulgencio Salinas, M.D. testified that Larissa "died as a result of a distant-type gunshot wound to the right upper abdomen, right upper quadrant that resulted in perforation of the liver, stomach, left kidney, with extensive hemorrhage into the cavity. And she also received a blunt trauma to the head with extensive edema, with extensive hemorrhage inside the brain, that led to her death." Dr. Salinas could not state definitively which of the two injuries actually caused her death. Dr. Salinas stated that Larissa also had lacerations to her eyes, a black eye, a busted lip, and an injury to her chin all caused by some form of trauma.

David White, a lieutenant with the Edinburg Police Department, testified that he conducted a walk-through with Sergio of Larissa's apartment after her death to determine if anything was missing. Lieutenant White learned that Larissa's cell phone was missing. Lieutenant White acquired a subpoena for the GPS coordinates of Larissa's cell phone on December 28, 2005. Lieutenant White located the coordinates on Map Quest which "gave . . . [an] area in McAllen at 26th and Elmira. It puts a star on one location, and the star would be just east of 26th and south of Elmira. And the north side, if you could imagine the distance on it, you would imagine an alleyway, so it would just be north of there. We—I looked at it and figured it's one or two houses in from 26th." Lieutenant White stated that Elmira is in the Balboa neighborhood.

8

Lieutenant White joined other police officers in the search for Larissa's cell phone on Elmira. Lieutenant White stated that he focused his attention specifically on a green house at 2513 Elmira.[9] When the officers arrived at the location, Lieutenant White observed a man tending to the yard at the green house. The man left shortly after the police officers arrived. Lieutenant White noticed that the front door of the green house had a pad lock and when he knocked, no one responded.

A second and third trace of the phone placed it in the same neighborhood, but the accuracy had decreased. Lieutenant White did not recover Larissa's phone. On cross-examination, Lieutenant White testified that he believed, based on the GPS tracking, that Larissa's phone was located in that area. On re-direct examination, Lieutenant White clarified that he was not able to search the green house at 2513 Elmira on that day.[10]

Heather Monjares, Quintanilla's ex-girlfriend, testified that during the week before Christmas 2005, she, Quintanilla, and Alfredo Valdez "hung out" at a green house located in "La Balboa [neighborhood] on Elmira."

Joe Gabriel Vega, a detective with the Edinburg Police Department, testified that he joined Lieutenant White on December 28, 2005 on Elmira Street searching for Larissa's cell phone. Detective Vega stated that police officers photographed and collected evidence from the trash during their search for Larissa's phone. Detective Vega testified that one of the items that was found in the trash on December 28, 2005

---

[9] Robert Alvarez, a detective with the Edinburg Police Department, testified that he joined the search for Larissa's cell phone on Elmira Street. Detective Alvarez testified that 2513 Elmira "had been identified as a central point that [Larissa's] phone had been pinged to."

[10] On cross-examination, Lieutenant White explained that at a later date, detectives searched the residence pursuant to a search warrant and did not locate Larissa's cell phone.

by the police and depicted in the photographs taken was Heather Monjares's "little yellow picture ID."[11]

Detective Vega did not realize how Monjares's ID was connected to the investigation of Larissa's death until April 18, 2006, when he spoke to Alfredo Valdez, Quintanilla, and Monjares. On April 24, 2006, a search warrant for 2513 Elmira was issued. According to Detective Vega, the police searched inside the residence and in a shed outside; however, they did not collect any evidence at that time.

Detective Vega testified that based on his investigation, he eventually contacted Lyons and Lyons gave him a statement. Detective Vega stated, "[W]e learned that Mario Quintanilla was the person of interest or he had already been a person of interest. With the information he provided kind of, I don't know, I guess, solidified the information."

Detective Vega testified that he interviewed two strippers to verify the information that Lyons had provided. One of the strippers was Elizabeth Selena Moreno, also known as Liz, and the other was Yanera Hernandez, also known as Mercedes. According to Detective Vega, Mercedes was able to verify the locations where the group "hung out" on December 18, 2005. Detective Vega stated that although Mercedes did not recall the addresses of the places where the group went, she was able to show him that one of the houses was located on Elmira.[12] Detective Vega agreed with the

---

[11] Detective Alvarez stated that the trash can where Monjares's ID was found was located behind a "wooden gate that leads directly into 2513 Elmira to the backyard." He further stated that the officers "had known that that trash [that was found] was taken out of [2513 Elmira] because we saw an elderly gentleman cleaning the area and taking that trash can out into the—out into the alleyway. . . ."

[12] Detective Alvarez testified that "[o]ne of the strippers also took [the officers] to 2513 Elmira Road" because she had been there with Quintanilla and "some other people."

10

prosecutor that it was the house at 2513 Elmira.  When asked if she was able to identify the green house, Detective Vega replied, "Yes, sir."

Detective Vega testified that after interviewing Jesus Cortez, a member of HPL, in jail, he acquired an arrest warrant for Alfredo Valdez (Fro), Quintanilla, Jesus Oscar Arcos, and Gilberto Martinez for capital murder on December 11, 2006.  Detective Vega was able to locate Alfredo Valdez in Dalton, Georgia.   Valdez was living with Quintanilla's brother, Felix Quintanilla.  According to Detective Vega, Valdez was using an alias[13]; however, a family member assisted them in finding Valdez.  Valdez gave police two statements, and he also provided a "walk-through" of the crime-scene.

John B. Minor, a communications consultant, testified as the State's expert witness regarding Sprint's tracking of Larissa's cell phone after her death.   Minor testified that a Sprint employee entered Larissa's cell phone into the network to locate the phone using the GPS chip.  According to Minor, there were four different "locate techniques" that could have been used to find Larissa's cell phone and each level of tracking provided a larger radius where the phone might be located.[14]  How the tracking occurred was automatic within the network and depended on a variety of factors; no person was involved in determining the level of the tracking.

According to Minor, if the cell phone is placed in a glove box, under a car seat, in a trunk, in a building, buried in the ground or in a similar location, but is still able to

---

[13] The trial court admitted an identification card issued by the State of Georgia to Gabriel Quintanilla.  Detective Vega testified the picture on the ID was of Alfredo Valdez.

[14] Minor explained that the best locate technique is the first tier or the "A-GPS . . . because it has the highest level of accuracy capability," which is approximately five to thirty meters.  The next level would be the "hybrid GPS solution," which "can range out to 50-meter inaccuracy, as far as getting to a further distance."  The third level is trilateration, which ranges from fifty to two hundred meters.  Minor described the fourth level as "pie slices" and explained that "its accuracy would be whatever size that sector is.  It can be several square miles.  It can be 100 meters."

11

communicate with the cell tower, then the "fallback technique called hybrid GPS" would be utilized to find the cell phone. Minor explained that although, the hybrid GPS technique could calculate a rough estimate of the phone's location, it is less accurate than the first tier technique. Minor stated that if the phone is turned off or if the battery dies the locate techniques will fail.

Minor testified that he reviewed the GPS coordinates of Sprint's security location query access reports regarding Larissa's cell phone. Those reports were generated on December 28, 2005. Minor, referring to pictures of an aerial view of a neighborhood which were shown to the jury, explained that Larissa's cell phone was within fifteen meters of the latitude and longitude reflected by a red dot in the first photo, and within twenty-one meters of the area he pointed to in the second photo.[15] The prosecutor asked Minor to describe for the record where the latitude and longitude coordinates appeared on the screen that they were viewing. Minor replied, "Well, what—what I saw was that it—it appears to be a residential area on Elmira Avenue near the intersection— just east of the intersection of South 26 Street. . . . Looks like it's on the south side, approximately the second house from the corner there going east, based upon what I could see from the coordinates."[16]

Minor testified that a third location query of Larissa's cell phone was conducted a "couple of hours after the second one." Minor agreed that "[t]here's a huge drop-off in accuracy between the second one . . . and the third one." Minor believed that the accuracy decreased because the battery of the cell phone was dying. On cross-examination, Minor clarified that the third location query measured an accuracy radius

---

[15] The photos of the neighborhood containing the red dots are not included in the record.

[16] The record reflects that Elmira Avenue is located in the "Balboa Neighborhood."

of "4,300 meters." Minor demonstrated to the jury the area he believed encompassed the 4,300 meters and was included in a "pie slice." It appears from the record that the residential area on Elmira Avenue is included within that "pie slice."

Gerardo Garcia testified that he and Quintanilla were members of HPL. Garcia no longer considers himself a member of HPL. Garcia claimed that HPL is a "criminal organization" that does "crimes as far as murder, extortion, [and] drug dealing." Garcia stated that members of HPL get identifying tattoos such as a ".45 pistol on the waistband" "bullet tattoos; the HPL symbol, which is the P that has an eagle, the—instead of a P, there's the eagle head which stands for the P."

Garcia testified that in 2006, he was in charge of all the HPL members inside the Hidalgo County Jail who were housed in eight-man dorms. According to Garcia, Quintanilla was placed in the county jail with him in 2006 for a misdemeanor charge and was "in and out of county jail at the time." Garcia testified that Quintanilla had a .45 tattoo on his waist, a tattoo of an eagle head on his abdominal area, and "teeth marks on his rib cage."[17]

Garcia became aware of Larissa's death when he attended a family member's graduation party. Garcia did not know at the time who had committed the murder. However, Quintanilla brought up the subject of Larissa's murder with Garcia while the two men were in jail together. Garcia stated that Quintanilla had told him that Quintanilla was expecting the Edinburg Police Department to bring murder charges against him "pretty soon." Garcia said, "So when [Quintanilla] came back into the tank, he told me that at least he lasted out there a year before being charged with murder."

---

[17] The prosecutor asked that Quintanilla remove his shirt to show if he had the tattoos described by Garcia or any scars present on his body. After a hearing outside the jury's presence, Quintanilla took off his shirt.

13

When asked to describe Quintanilla's demeanor, Garcia stated, "He acted normal, like it was second nature; it was—it was no big thing, as if he was just getting convicted out of some other minor charge."

According to Garcia, on another occasion, the two men were "trading war stories" and Quintanilla told Garcia that he and Fro, Alfredo Valdez, had committed a home invasion to steal some drugs from a drug dealer and that he had shot the girl at the apartment. Garcia stated that Fro and Quintanilla were both from the Balboa neighborhood. Garcia claimed Quintanilla told him

> about a time when [Quintanilla] was partying at one time in an Edinburg apartment with other accomplices—I mean other acquaintances: HPL by the name of Fro, Alfredo Valdez, and Jason Lyons by the nickname of Gotti. They were partying at an Edinburg apartment, as he quoted, with some strippers, and it's, you know, just partying on cocaine and alcohol.
>
> . . . .
>
> That a few days later, they—they tried to go—they kept on partying afterwards, days afterwards, partying on crack cocaine, binge-smoking crack cocaine and doing crack, just snorting cocaine. That's what the term, as far as "partying" means.
>
> So when they ran out of supply, they tried to go back to a place where they had partied before at this certain apartment. So him and his accomplice by the nickname of Fro, they went back to this apartment to see if they still had some cocaine in there. So he told me that they—they went and kicked down this door at this apartment.
>
> . . . .
>
> [Quintanilla] said that he was surprised to have seen a female there by herself, and as far as—he didn't go into the specifics but just said—in Spanish, in his exact words, he said (Spanish spoken) "La pencha culera no queso dejir nada."[18]

---

[18] The interpreter translated the phrase to mean, "That the—that the girl didn't want to say anything." Garcia responded that "the term 'culera' would mean as—would be more a phrase of vulgar language." During cross-examination of Garcia by Quintanilla's defense counsel, the interpreter stated that "bitch" would be an accurate translation of the word "culera."

14

. . . .

And . . . afterwards, [Quintanilla] said . . . "So se me fue un tiro," meaning a bullet went astray.  You can put it in that sense.[19]

On re-direct examination, the prosecutor asked Garcia whether he had previously heard that Quintanilla had killed Larissa.  Garcia replied that he had.

Jesus Cortez testified that he had been a member of HPL and was currently incarcerated at the Hidalgo County Jail.  Cortez stated that he had grown up with Quintanilla in the Balboa neighborhood in McAllen.  Cortez claimed that he and Quintanilla were members of the Balboa neighborhood gang.

Cortez testified that in the fall of 2006, he arrived at the Hidalgo County Jail, and approximately one week later, Quintanilla was placed there also.  According to Cortez, the other members of HPL were awaiting Quintanilla's arrival because Quintanilla had been in fights and arguments with other members of HPL.  Specifically, Cortez claimed that Quintanilla had accused Jesus Espinosa ("Escalera" or "the Ladder") of flirting with his girlfriend and had "barricaded himself outside the . . . yard from 'Escalera,' . . . ."  Cortez stated that the HPL members had decided to discipline Quintanilla by placing him "on the 'amarilla', which means on the yellow, for six months."  This meant that Quintanilla would not be allowed to have any information about HPL and could not vote.  Cortez explained that a person "on the yellow" would feel "left out" and "in the dark."  Cortez stated that the men surrounded Quintanilla and aggressively told him that he was being disciplined; Quintanilla accepted the discipline.

---

[19] The interpreter translated the phrase as, "A bullet went astray."

15

Cortez testified that shortly after being disciplined, Quintanilla asked to speak with him, so the two went "into the corner and he starts talking." Cortez said that Quintanilla told him he was sad because he had been doing a lot of drugs, his family had "cut him off," and the members of HPL were "treating him kind of cold." Cortez claimed that Quintanilla began crying and said, "Hey, carnal, . . . but the thing that bothers me the most is that thing with the 'Chavalona', right." Cortez said, "With the little girl. . . . 'Chavalona.' That's another term, you know, for a young girl."[20] Cortez testified that he asked Quintanilla "What Chavalona," and that Quintanilla replied, "That girl we killed in Edinburg. And me and Fro."[21] Cortez said that he replied, "Oh, yeah, right. I know what you're talking about. I heard of it, you know. Right."

Cortez stated that he asked Quintanilla to tell him what happened and then testified as follows:

> Well, the thing that I remember asking him is, "Man, carnal, but that wasn't even the apartment, right?"
>
> And then he was, like, "Yeah, it was carnal. You know, Gotti—Gotti put us the 'tiro,' right?" You know, the—the "tiro" is like another name for home invasion, right? Like, "tiro," you know, we call it, you know.
>
> And he told us that Gotti had put the tiro and that—you know, that they had gone in and they went in and said, "You go over there." (Spanish spoken.) You know, like, "You go over there, and you go over there," right? And then he had gone into the room, and then, when the girl sat up, right. Well, no. He said, "Miro una savanna," right; like a sheet. "I saw a sheet," right; like, "I saw a sheet.["] And he just said—he does with his hands, like, you know what I mean? He—and he just, like, does with his shoulder, like, "I hit her," right? Like, "I shot her," right? And then—and then I remember he said that he went up—he went and got her, right, and that, you know—you know what I mean? He started, like, hitting her, like, "Where's the money," right? And that the girl was, like, "No, there's no money. There's no money," right? Like, you know? "There's no money."

---

[20] The interpreter stated that "Chavalona" means "A young girl."

[21] Cortez stated that Fro is Alfredo Valdez.

16

And that he kept on hitting her and then that's when she was like, "Okay, okay, I'll get you, you know, some money," right? And then she was like—then she said again, "No, man, for real, there's no money. I don't have any money."

. . . .

[S]o when she finally said, "No, there's no money," right, he said, "Well, fuck the bitch." You know what I mean? And—and I guess he hit her again. Like, he just, like, "fuck the bitch"; you know what I mean? That's what he said.

Cortez clarified that Quintanilla had explained that the girl had moved to a sitting position when he saw the sheet "and that's when he . . . he shot." Cortez stated that Quintanilla had indicated with his hand that the bullet had hit the girl "somewhere [in the chest area]." According to Cortez, Quintanilla told him that after he shot the girl, he "got her by, you know, by the hair, like . . . in this motion." Cortez explained that Quintanilla "made a hand gesture [l]ike if you're wrapping, like, the hand, you know, around the hair." Then according to Cortez, Quintanilla said that the girl said there was no money and he said, "Fuck the bitch." Cortez agreed that he was making the gestures as described by the prosecutor. The prosecutor described Cortez's gestures as follows: "[Y]ou have one hand in a fist as if holding somebody's hair . . . . With the other hand, you're swinging— . . . . Towards that fist. . . . . Your hand is in the shape of a gun."

## II.    CORROBORATION OF JAILHOUSE INFORMANT TESTIMONY

By his first issue, Quintanilla contends that there was no corroboration of the testimony of Gerardo Garcia and Jesus Cortez who were jailhouse informants. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075 (West Supp 2011). The State agrees with Quintanilla that the testimony of jailhouse informants must be corroborated.[22] *See id.*

---

[22] The jury charge included an instruction setting out that corroboration was required of Garcia's and Cortez's testimony.

17

Because the statute requiring corroboration of jailhouse informants is relatively new, the court of criminal appeals has not yet addressed it; however, Quintanilla and the State agree that we should apply the law pertaining to accomplice witness corroboration. This Court has determined that the law applying to cases involving corroboration of accomplice witness testimony also applies to cases involving corroboration of jailhouse informants. *See Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi 2011, no pet.) (citing *Watkins v. State*, 333 S.W.3d 771, 778 (Tex. App.—Waco 2010, pet. ref'd)).

## A.     Applicable Law

A person cannot be convicted based upon the testimony of a jailhouse informant unless that testimony is "corroborated by other evidence tending to connect the defendant with the offense committed." *See* TEX. CODE CRIM. PROC. ANN. § 38.075. It is not necessary for the corroborating evidence to be sufficient in itself to establish guilt beyond a reasonable doubt. *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994) (en banc). The non-jailhouse informant evidence does not have to link the accused directly to the commission of the offense. *Id.* However, there must be some non-jailhouse informant evidence that tends to connect the accused to the commission of the offense. *Id.* Both direct and circumstantial evidence may furnish the necessary corroboration. *Reed v. State*, 744 S.W.2d 112, 126 (Tex. Crim. App. 1988) (en banc). "Insignificant circumstances sometimes afford most satisfactory evidence of guilt and corroboration of [jailhouse informant] witness testimony." *Id.* "To evaluate the sufficiency of corroboration evidence, we must eliminate all of the accomplice/jailhouse-informant testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the

commission of the crime." *Ruiz*, 358 S.W.3d at 681 (citing *Castillo v. State*, 221 S.W.3d 689, 691 (Tex. Crim. App. 2007)).

We judge the sufficiency of non-jailhouse informant evidence according to the particular facts and circumstances of each case. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). "The direct or circumstantial non-[jailhouse informant] evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the fact[-]finder's resolution of the evidence." *Id.* As a reviewing court, we are not to independently construe the non-jailhouse informant evidence and are to consider the combined force of all of the non-jailhouse informant evidence that tends to connect the accused with the offense. *Id.*

## B.    Discussion

Here, the State presented evidence that Quintanilla was partying with Alfredo Valdez (Fro) around the time that Larissa was killed and that Quintanilla had been at Larissa's apartment to buy cocaine. *See Reed*, 744 S.W.2d at 127 (providing that evidence that the accused was at or near the scene of the crime at or about the time of its commission, coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction). Evidence was presented that Alfredo Valdez had been arrested for Larissa's murder, that after the murder, he fled to Georgia, and had stayed with Quintanilla's brother under an alias. *See Jackson v. State*, 745 S.W.2d 4, 13 (Tex. Crim. App. 1988) (en banc) ("Although the presence of the accused in the company of the accomplice, near the time of the offense, while alone is not conclusive[,] it nevertheless is an important

19

factor in determining corroboration."). Evidence was presented that Quintanilla and Valdez were members of HPL and that HPL engaged in criminal activities, including burglaries.

Lyons testified that when he went with Quintanilla to buy cocaine from Foreman, Quintanilla disobeyed his request to stay in the car. Lyons testified that Quintanilla should not have knocked on the door when Lyons was purchasing the cocaine from Foreman. Foreman testified that Lyons apologized to him because the unknown man knocked on the door during their transaction. From this evidence, the jury was free to infer that Quintanilla's behavior was suspicious. *See Smith*, 332 S.W.3d at 445 (providing that the defendant's behavior or actions prior to or following an offense may tend to connect the defendant with the commission of the offense).

Lyons further stated that Quintanilla seemed overly eager about meeting Foreman. According to Lyons, Quintanilla continued to complain that Lyons failed to introduce him to Foreman. Lyons testified that it is understood that when a person has not been introduced to one's drug connection, the person should not attempt to meet the connection and that this behavior could actually get someone killed. Lyons wondered why Quintanilla would want to know Foreman because it was not proper to ask to meet him. Lyons also testified that he told Quintanilla that Foreman "moves big, sells a lot of cocaine." Again, from this evidence, the jury could have inferred that Quintanilla's behavior was suspicious and that he had a motive to burglarize Larissa's apartment. *See Bush v. State*, 628 S.W.2d 441, 444 (Tex. Crim. App. 1982) (en banc) (establishing that motive is relevant as a circumstance tending to prove the commission of an offense); *see Reed*, 744 S.W.2d at 127 (stating that although alone, evidence of

20

motive is insufficient as corroboration, it may "be considered in connection with other evidence tending to connect the accused with the crime").

The State presented evidence that Larissa's cell phone had been taken from her apartment. On December 28, 2005, the GPS tracking system located the phone on Elmira in the Balboa neighborhood. Detective Alvarez stated that the central point of the signal's "ping" was at a house at 2513 Elmira. A stripper who was with Quintanilla on December 18, 2005, told police officers that she had "hung out" with him at a green house on Elmira. She identified the house at 2513 Elmira as the house where the group "hung out." Police officers found Monjares's photo ID in the trash at the house at 2513 Elmira. Don Beto was cleaning the property at 2513 Elmira on December 28, 2005, because someone had recently been there without the owner's consent and had left a mess.

While the foregoing circumstances individually may not each be sufficient to corroborate the jailhouse informants' testimony in this case, we find that rational jurors could have concluded that the above evidence, taken together, sufficiently tended to connect Quintanilla to Larissa's murder. *See Cox v. State*, 830 S.W.2d 609, 612 (Tex. Crim. App. 1992) (en banc) (concluding that evidence of other suspicious circumstances filled the sufficiency gap left by evidence of appellant's mere presence at scene of offense); *Paulus v. State*, 633 S.W.2d 827, 846 (Tex. Crim. App. 1981) (en banc) (noting that evidence showing motive or opportunity can be considered in connection with other evidence tending to connect the accused with the crime). Accordingly, we overrule Quintanilla's first issue.

### III.    ALFREDO VALDEZ'S REFUSAL TO TESTIFY

21

By his second issue, Quintanilla contends that his constitutional rights were violated when the State called Alfredo Valdez to testify over his objection. Specifically, Quintanilla claims that the trial court incorrectly determined that Valdez did not have a Fifth Amendment right against self-incrimination and that the State asked an improper question after Valdez invoked his right against self-incrimination.

## A. Pertinent Facts

Prior to the State calling Valdez to testify, the trial court held a hearing outside the presence of the jury. At this hearing, Valdez indicated that he would not take the oath and that he would not testify in this trial. The following exchange occurred:

The Court: Swear him in.

The Bailiff: Raise your right hand. You swear the testimony you are about to give will be the truth, the whole truth and nothing but the truth, so help you God?

[Valdez]: No.

The Court: You don't swear?

[Valdez]: Huh?

The Court: You're not going to swear?

Don't give that face to me.

[Valdez]: I don't care.

The Court: Are you going to swear or not?

[Valdez]: No, I'm not.

The Court: Do you affirm—

[Valdez]: I don't care.

The Court: —to tell the truth?

[Valdez]: I don't care. Yes. I don't care.

22

The State proceeded to question Valdez.  The following exchange occurred:

> [The State]: Mr. Valdez, you remember, back at the sentencing phase of trial, you gave your word to the family, to the Court—
>
> [Valdez]: I don't care.  I don't care.
>
> Q: —to the D.A.—
>
> A: Whatever.  Whatever.  Blah, blah, blah.
>
> Q: Are you going to testify?
>
> A: No.
>
> Q: Who spoke to you at the county jail on Sunday night?  Do you remember speaking to me on Thursday, Mr. Valdez?
>
> The Court: You've got to answer, Mr. Valdez.
>
> [The State]: Do you remember speaking with us, Mr. Valdez?
>
> You told us you were going to testify.  Remember that?  And then you spoke with [defense counsel] . . . . What did they tell you?
>
> Are you afraid to say it in front of them?

Quintanilla's trial counsel objected to the State's questions regarding whether Valdez had spoken to anyone on Quintanilla's defense team because it was an "insult." The trial court explained that there was no insult and that Valdez did not have a Fifth Amendment privilege against self-incrimination.  The trial court clarified that Quintanilla's defense counsel was objecting to the form of the State's question and sustained his objection on that basis.

The trial court determined that Valdez was not going to answer the State's questions and stated that it would hold Valdez in contempt for failing to answer the questions.  The trial court then held Valdez in contempt of court and again stated that

23

Valdez did not have a Fifth Amendment right against self-incrimination because he had been convicted. The trial court stated, "You have been convicted. You have no right to appeal. You gave up your right to appeal at sentencing. You said you were going to testify. You're failing to live up to that bargain. The problem is that the State has no way of enforcing that agreement." Neither Valdez nor Quintanilla's defense counsel stated that Valdez was invoking his right against self-incrimination. The trial court informed the parties that it would not allow Valdez to invoke "any type of privilege in front of the jury" because that would be improper. The prosecutor told the trial court that Valdez did not have "the privilege." Quintanilla's defense counsel did not disagree with or object to the State's assertion that Valdez did not have "the privilege."

Quintanilla's defense counsel then stated, "I'm going to object to any inference being made that, for whatever reason, this individual . . . . that they are going to try to lay to the jury is that, somehow or the other, he's decided that he doesn't want to say something because of something that we did." The trial court assured Quintanilla's defense counsel that it would not allow the prosecutor to do such a thing. The trial court then instructed the State not to ask "any questions insinuating that the attorneys had anything to do with his failure to testify."

Quintanilla's defense counsel then objected to the State calling Valdez as a witness on the basis that there was "no purpose" and it would not "add a single shred of evidence to the case either way." Defense counsel claimed the only purpose of calling Valdez to the stand would be "to prejudice the jury because he's going to come in here and not answer a single question." The State argued that if Valdez chose not to answer the questions, there would be no prejudice. The jury entered the courtroom, and the State called Valdez to testify.

24

The State requested for Valdez to show his hands to the jury, and he complied. The State then asked the following question, without objection: "Mr. Valdez are you the same Alfredo Valdez that was convicted for Capital Murder of Larissa Cavazos?" Valdez did not respond. The trial court asked Valdez if he was going to answer the question, and he nodded his head, apparently indicating that he would not answer the question. The trial court asked the jury to take a break, and they left the courtroom.

The following events occurred outside the presence of the jury. The trial court again instructed Valdez that he did not have a "Fifth Amendment right to remain silent" and asked him if he understood that. Valdez nodded his head and the trial court stated that he understood that Valdez had indicated that he understood the trial court's instruction. Valdez continued to refuse to answer questions and indicated by nodding that he was not going to testify. The State did not call Valdez to the stand to testify again.

## B.    Discussion

First, we must determine whether it was error for the trial court to allow the State to call Valdez as a witness. In this case, the record reflects that pursuant to a plea bargain with the State, Valdez pleaded guilty to Larissa's murder and agreed to testify at Quintanilla's trial. In *Washburn v. State*, the court of criminal appeals stated, "Unless the witness has agreed to turn state's evidence, the prosecution ought not to place him on the stand; to do so and wring from him a refusal to testify, affording to the jury an opportunity to consider the refusal as a circumstance of guilt, has been said to be 'certainly prejudicial.'" 299 S.W.2d 706, 708 (Tex. Crim. App. 1956). Here, Valdez had agreed to testify for the State; therefore, the State's action in placing Valdez on the stand was not prejudicial. *See id.* Furthermore, the record shows that Valdez did not

25

invoke his right against self-incrimination in front of the jury. Instead, Valdez, without stating the reasons, refused to answer the only question asked by the State. We will not speculate on Valdez's reasons for refusing to testify in this case.

Quintanilla also points out that, although Valdez had agreed to testify for the State, there is nothing in the record indicating that he had been granted immunity from prosecution. *See Perez v. State*, 41 S.W.3d 712, 718-19 (Tex. App.—Corpus Christi 2001, no pet.) ("A witness who has been granted use immunity for his testimony, does not have a valid basis for refusing to testify."). However, we are not persuaded by this argument because when the trial court was making its determination whether to allow the State to call Valdez as a witness, the State informed the trial court that Valdez had agreed to testify against Quintanilla in a plea agreement and Quintanilla did not inform the trial court that the State was required to show that Valdez had been granted immunity.[23]

Moreover, the court of criminal appeals has held that it was harmful for the State to call a witness to testify knowing that the witness would invoke his or her right against self-incrimination when the State also asked a series of damaging questions in a way that invited the jury to assume the answers to the questions would be in the affirmative. *See Perez*, 41 S.W.3d at 719 (citing *Coffey v. State*, 796 S.W.2d 175, 177 n.4 (Tex. Crim. App. 1990)). Here, the State did not ask a series of damaging questions, such as those asked in cases finding harm, which the court of criminal appeals stated invited the jury to assume that the answers would be in the affirmative. In those cases, where it was determined that the appellant had been harmed, the prosecutors asked a series of

---

[23] Quintanilla cites to a post-trial hearing wherein he claims the State admitted that Valdez did not have immunity to testify. However, at trial, when the trial court was making its decision, no one informed it of that fact.

questions regarding the appellant's acts that contributed to the crime. *See id.* ("In *Washburn*, the State asked fact-laden questions to suggest how the crime was committed. In *Vargas*, although the court did not set out the State's line of questioning, it relied on *Washburn* concluding the proceeding was prejudicial. This suggests that it was not the calling of the witness who claimed his fifth amendment privilege but the questioning that influenced the courts' conclusions."). Here, the State's question did not implicate Quintanilla or relate to Quintanilla's alleged criminal acts.[24] Therefore, we find this case distinguishable from those cases finding error. *See id.*

Next, we must determine whether the State's question, "Mr. Valdez are you the same Alfredo Valdez that was convicted for Capital Murder of Larissa Cavazos," prejudiced Quintanilla. No objection was made to the State's question. *See Taylor v. State*, 653 S.W.2d 295 (Tex. Crim. App. 1983) (determining that the appellant had preserved his complaint that the State continued to question a witness who had invoked the Fifth Amendment because he objected "to this line of questioning" and the trial court ruled on the objection before determining whether the appellant was harmed). Therefore, this complaint has not been properly preserved. *See id.*

Finally, Quintanilla complains that after Detective Alvarez identified Valdez, the prosecutor stated, "Your Honor, may the record reflect he's identified the witness that came and refused to answer questions the other day," and that the prosecutor asked Detective Vega if Valdez had given a statement and done a walk-through of the crime scene. However, no objections were made to these questions. *See* TEX. R. APP. P. 33.1. We overrule Quintanilla's second issue.

---

[24] To find that Quintanilla was harmed by the State's question, we would have to infer that the State's question led the jury to believe that Quintanilla assisted Valdez with the murder. We have no authority supporting such a conclusion.

27

## IV. DISPLAY OF TATTOOS

By his third issue, Quintanilla contends that "[t]he numerous tattoos possessed by [him] were inflammatory and highly prejudicial in that they caused the jury to render a judgment based on their opinion of [his] character traits as opposed to the evidence before them." Specifically, Quintanilla complains that the trial court compelled him to remove his shirt in front of the jury so that they could see the tattoos on his body.

### A. Pertinent Facts

During Garcia's testimony, the State asked Garcia some questions concerning Quintanilla's tattoos. Garcia stated that he had "tattooed an eagle head on [Quintanilla's] abdominal area, and [that Garcia] noticed [Quintanilla] had teeth marks on his rib cage." The State asked if Quintanilla could remove his shirt to show whether these marks were on his body. The trial court instructed Quintanilla to comply. Quintanilla's defense counsel asked the trial court to clarify what items of clothing would be removed. The trial court stated, "Just his shirt. Just open his shirt." The record reflects that Quintanilla complied with the request. The prosecutor, however, stated that he was requesting that Quintanilla remove his shirt. The trial court asked the jury to take a break.

A hearing was held outside the presence of the jury. During this hearing, defense counsel objected on the basis that the tattoos were not relevant and allowing the jury to view the tattoos would be prejudicial. The State argued that allowing Garcia to identify the tattoos would show that he had been in jail with Quintanilla and that they had a relationship. The defense argued that Garcia had already identified Quintanilla and that it had not challenged his identification. The defense argued further that it had not disputed the testimony that Quintanilla was a member of HPL.

28

Defense counsel told the trial court that the only purpose of asking Quintanilla to show his tattoos was to inflame the jury and create prejudice. The trial court asked "In what sense," and defense counsel responded, "To show that he's got other artwork on his arms and, somehow or the other, lead them to believe, because that he's got these tattoos, he must, per se, be a bad individual." The State argued, "We think all of that goes to his intimate relationship—not that they were lovers—his relationship and how closely he was with this individual so that he can testify to the things that he says he knows and that he heard." The trial court ruled that Quintanilla would remove his shirt when the jury returned to the courtroom and that the jury would be allowed to view those tattoos.

The jury returned to the courtroom. The record reflects that Quintanilla removed his shirt while facing the jury. The trial court then instructed Quintanilla to put his shirt back on. Garcia then testified that he observed that Quintanilla had on his waistband a tattoo of a ".45" as he had previously testified, and had an eagle head on his abdominal area. Garcia stated that he was unable to see whether Quintanilla had the teeth marks.

**B.     Discussion**

Quintanilla argues that the tattoos were not probative because "[i]dentity was established thoroughly beforehand, and the only tattoo going to establish gang membership had already been offered into evidence." Quintanilla claims that "[a]ny probative value was far outweighed by the potential that [his] multiple tattoos would impress the jury in an emotional indelible way" and the tattoos were "mainly" evidence that he had a bad character.

Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or

29

less probable than it would be without the evidence. TEX. R. EVID. 401. Here, the trial court found that the tattoos were relevant, stating that although the defense did not dispute Garcia's identification of Quintanilla, Foreman had disputed Lyons's claim that Quintanilla was the man who accompanied him to Larissa's apartment to buy cocaine.[25] The trial court explained that there was conflicting evidence regarding whether Foreman saw tattoos on the man's arms, and that allowing the jury to view the tattoos would assist them in that determination. Furthermore, the State offered the evidence to show Garcia's knowledge of Quintanilla's body due to their close relationship. We conclude that evidence that Quintanilla had the tattoos as described by Garcia was relevant. *See id.*

We next consider Quintanilla's objection that the unfairly prejudicial nature of the evidence outweighed its probative value. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. Quintanilla claims that the tattoos he was compelled to show were not gang related and that he "had already displayed the gang tattoo across his abdomen." Quintanilla cites no authority, and we find none, providing that non-gang related tattoos "would impress the jury in an emotional indelible way." Instead, Quintanilla cites *Montgomery v. State*, which is a case that explains that extraneous misconduct is not admissible under rule 404(b). 810 S.W.2d at 390–91. However, at trial Quintanilla did not object on the basis of 404(b).[26] *See* TEX. R. EVID. 404(b). Therefore, we conclude that Quintanilla's claim regarding the non-gang related tattoos as being prejudicial is

---

[25] Quintanilla has consistently disputed that he was the man who went with Lyons to Larissa's apartment on December 18, 2005 to buy cocaine.

[26] We note that evidence of Quintanilla's affiliation with HPL was admitted throughout the trial, without objection.

without merit. *See Montgomery*, 810 S.W.2d at 390-91 (explaining that a trial court has broad discretion in admitting or excluding evidence, and only when the court abuses its discretion should an appellate court conclude that the ruling was erroneous); *see also Garza v. State*, 213 S.W.3d 338, 347 (Tex. Crim. App. 2007) (concluding that the trial court did not abuse its discretion by requiring the defendant to display his gang related tattoos because the tattoos were admissible and their probative value was not outweighed by the danger of unfair prejudice). Regarding the "gang tattoo," because Quintanilla acknowledges that he showed that tattoo to the jury, without objection, before he objected to removing his shirt, he has no complaint on appeal. *See Chamberlain v. State*, 998 S.W.2d 230, 235 (Tex. Crim. App. 1999); *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991); *Mitten v. State*, 228 S.W.3d 693, 696–97 (Tex. App.—Corpus Christi 2002, pet. dism'd) (recognizing that "the well-established rule [is] that any error in admitting evidence over a proper objection is harmless if the same evidence is subsequently admitted without objection"). We overrule Quintanilla's third issue.

## V.    SUFFICIENCY OF THE EVIDENCE

By his fourth issue, Quintanilla contends that the evidence is legally and factually insufficient to support his conviction. Specifically, Quintanilla argues that there were no eyewitnesses to the crime, no forensic evidence that tied him to the scene, no clear motive for the crime, and no evidence tying him to the scene of the crime. Quintanilla also points to evidence he believes was contradictory and that discredited the witnesses.

### A.    Standard of Review and Applicable Law

31

The court of criminal appeals has held that there is "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual-sufficiency standard" and that the *Jackson* standard "is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 902–03, 912 (Tex. Crim. App. 2010) (plurality op.). Accordingly, we review Quintanilla's claims of evidentiary sufficiency under "a rigorous and proper application" of the *Jackson* standard of review. *Id.* at 906-07, 912. Moreover, we do not refer separately to legal or factual sufficiency and will only analyze Quintanilla's issues under the *Jackson* standard. *See id.* at 985 (concluding that there is no meaningful distinction between a legal and factual sufficiency analysis).

Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks*, 323 S.W.3d at 898–99 (explaining that in the *Jackson* standard we consider "all of the evidence in the light most favorable to the verdict," and determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt). "[T]he fact[-]finder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution." *Jackson*, 443 U.S. at 319 (emphasis in original); *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases is the exclusive judge of facts proved and the weight to be given to the testimony . . . ."); *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000)

32

("The jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence.").

We measure the legal sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Coleman v. State*, 131 S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref'd) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). In this case, Quintanilla committed capital murder if he committed murder as defined under section 19.02(b)(1) of the penal code and he intentionally committed the murder in the course of committing or attempting to commit burglary or robbery. *See* TEX. PENAL CODE ANN. § 19.03(a)(2); *see also id.* § 19.02(b)(1).

**B.    Discussion**

Quintanilla does not challenge the specific elements of capital murder and instead complains that the evidence against him was contradictory and the witnesses' testimony was discredited. However, it is well established that the fact-finder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). Therefore, the jury in this case was free to believe the State's witnesses and disbelieve Quintanilla's witnesses. *See id.*

Quintanilla complains of the lack of direct and forensic evidence linking him to the offense. However, the jury heard from Garcia and Cortez who testified that Quintanilla admitted to them that he shot Larissa while he was engaging in a home invasion. Cortez testified that Quintanilla told him that he had committed the home invasion with

the intent of stealing money and that he killed the girl when she told him that she did not have any money.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *see also Brooks*, 323 S.W.3d at 902–03. We overrule Quintanilla's fourth issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

_____
ROGELIO VALDEZ
Chief Justice

Do not Publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
27th day of August, 2012.

34